UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL J. COLLINS,

                Plaintiffs,              Civil Action No.
                                        09-CV-10418

vs.

                                        PAUL D. BORMAN
FAURECIA INTERIOR SYSTEMS, INC.,        UNITED STATES DISTRICT
                                        JUDGE

                Defendant.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

      This case is brought under Title VII of the Civil Rights Act of 1964 and the Michigan Elliot Larsen Civil Rights Act ("ELCRA"). Plaintiff Michael Collins, who is African American, claims that his former employer, Defendant Faurecia U.S.A. Holdings, Inc., failed to take prompt remedial action after learning that Plaintiff had been subjected to racially-motivated verbal harassment by a co-worker. Plaintiff also claims that he was unlawfully terminated from his position as an IT Technician in retaliation for filing an Equal Employment Opportunity Commission ("EEOC") complaint regarding the alleged workplace harassment. In his Amended Complaint,[1] which was filed on February 17, 2009, Plaintiff seeks an order requiring that he be reinstated, an order enjoining any further acts of discrimination, and compensatory and exemplary damages.

_____

      [1] Plaintiff, who was then proceeding *pro se*, filed his initial Complaint on February 3, 2009.

Now before the Court is Defendant's Motion for Summary Judgment. Defendant contends that Plaintiff cannot establish that (1) he was subjected to a racially hostile work environment, (2) Defendant failed to take prompt and appropriate remedial action, and (3) his termination was retaliatory. This matter has been fully briefed and the Court heard oral argument on August 5, 2010. For the reasons that follow, Defendant's motion will be granted in part and denied in part as follows: granted as to Plaintiff's Title VII and ELCRA retaliation claims; denied as to Plaintiff's Title VII and ELCRA racially hostile work environment claims.

## II. BACKGROUND

### A.

At all times relevant to this action, Plaintiff worked as an IT Technician for Defendant.[2] Oster Aff. at ¶ 4, Def. Ex. 2. Although Plaintiff worked at Defendant's Sterling Heights facility, the department in which Plaintiff worked, Shared Services, was headquartered at Defendant's Auburn Hills facility. Plaintiff's direct supervisor was Michael Barnard,[3] Defendant's Regional IT Leader, whose office was located in Auburn Hills. Barnard Aff. ¶¶ 1-2, Def. Ex. 30; Oster Aff. ¶ 4, Def. Ex. 2. Plaintiff's primary human resources contact was Kristin Wamsley, Defendant's Human Resources Generalist, whose office was also located in Auburn Hills. Wamsley Aff. ¶¶ 1, 3, Def.

---

[2] In its brief, Defendant states that Plaintiff began working in its Sterling Heights facility on October 27, 2006, as a contract employee of "Reliance One," who contracted with Defendant to provide temporary employees. On April 30, 2007, Plaintiff was hired as a direct employee of Defendant. Def. Br. at 1.

[3] Barnard is referred to as "Bernard" in Plaintiff's deposition and as "Menard" in the Michigan Employment Security Commission hearing transcript. All three references refer to Michael Barnard.

Ex. 18.  Plaintiff's onsite human resources contact was Sandra Buckner,[4] Defendant's Sterling Heights Plant Human Resources Manager.  Buckner Aff. ¶ 1, Def. Ex. 14.  Plaintiff also worked with Sterling Heights Plant Logistics Manager, Oswald Oster, a German national who, at all times relevant, was on temporary assignment in the United States.  Oster Aff. ¶¶ 2-3, Def. Ex. 2.

**B.**

This case arises out of allegations that one of Plaintiff's co-workers, Mike Maynard—who is white—directed several racially derogatory comments at him while at work.  The record in this case is not clear as to when some of the comments below were made.[5]

Plaintiff complains about the following five statements, all of which were allegedly made by Maynard while at work:

- **Statement #1**: Maynard entered a room where Plaintiff and at least three other African Americans were working and said: "O-o-o-o-h, it sure is dark in here . . . . O-o-o-o-h, I don't feel safe . . . . I hope I don't get mugged."  Collins Dep. at 82-83.  Among the people present when this comment was made was Edward Walker, a second shift supervisor, who testified that Maynard did, indeed, make this comment.

---

[4] Buckner has since married.  Her married name is Sabbagh.  The Court shall refer to her, as the parties do, by her maiden name.

[5] In his initial Complaint, Plaintiff alleged that the discriminatory acts began on July 28, 2007.  Def. Ex. 3, ¶ 5.  In his Amended Complaint, which is the controlling Complaint in this matter, and in his deposition, Plaintiff alleges that discriminatory comments were made as early as June 2007.  Am. Comp. at ¶ 12; Collins Dep. at 79.  In his EEOC charge, Plaintiff wrote that the earliest date on which any discrimination took place was August 11, 2007.  Def. Ex. 6, p. 2.  Thus, the record is entirely unclear as to when the alleged discrimination began – it could have been as early as June.  It could not have been as late as August, as Plaintiff wrote on his EEOC charge, because, as will be discussed later, Defendant began investigating Plaintiff's allegations in July.

In his response brief, Plaintiff states that "the date listed in his complaint, July 28, 2007, was the date [that] he was first called the 'N' word" and that "Plaintiff's EEOC charge and intake questionnaire . . . list the wrong dates."  Pl. Response Br. at 3.  The Court, in construing the facts in the light most favorable to Plaintiff for the purposes of the present motion, will assume that the first harassment occurred in June 2007.

Walker Dep. at ¶ 4, Collins Ex. D.

- **Statement #2**: Maynard stated in the presence of Plaintiff and Oster something to the effect of: "Don't you all brothers ever do any kind of work? You all just up here crazy." Oster apparently responded by saying something to the effect of: "dang, you all brothers." Collins Dep. at 86-97. However, Oster testified that he "never observed any Faurecia employee, including Mr. Maynard, make any inappropriate racial comment." Oster Aff. ¶ 16, Def. Ex. 2.

- **Statement #3**: Maynard made a comment to Plaintiff using the word "nigger." As described by Plaintiff in his deposition:

  > Q:     What did Mr. Maynard specifically say to you with regard to use of the N word?

  > A:     He was saying something about he turned on some generator. His boss told him to turn on the generator. And he was sitting there and he's like, yeah, . . . that thing blew up, man. He said: If I was dead, . . . my wife would have sued Faurecia and . . . she would came in here and said: Which one of you all niggers did this?

  Collins Dep. at 76. Walker testified that Plaintiff had complained to him that Maynard made the following comment regarding a malfunctioning piece of equipment: "if it [the malfunctioning equipment] blew up and I [Maynard] died, my wife would own Faurecia and a bunch of niggers." Walker Aff. at ¶ 8. This statement, which was apparently made in the same conversation as the statement recounted by Plaintiff above, was not discussed by Plaintiff in his deposition (or at least not in the excerpts that are before the Court). Maynard admitted to Walker that he did, indeed, make the statement about his wife hypothetically "own[ing] Faurecia and a bunch of niggers." *Id.* at ¶ 9.

- **Statement #4**: Maynard asked Plaintiff if he had ever been to jail, to which Plaintiff responded "no." Maynard then said: "well, you know how colored people are." Collins Dep. at 78; Def. Ex. 6, p. 2. This statement was made on or about August 14, 2007. Collins Dep. at 84. Plaintiff testified that he told Oster about this comment about fifteen minutes after it was made. *Id.*

- **Statement #5**: Maynard made a comment to Plaintiff about "picking cotton." Collins Dep. at 85. Maynard admitted to Walker that he made this comment. Walker Aff. ¶ 6, Pl. Ex. D. Plaintiff testified that this statement was made "in and around" August 24, 2007, *see* Collins Dep. at 85, but earlier in his deposition stated that he "can't say" if August 24, 2007, was the exact date. *Id.* at 78-79. Plaintiff

4

testified that he called Oster on the phone and told him about the comment three minutes after the comment was made. *Id*. at 85. Defendant disputes this and attaches Oster's phone records, which do not reflect an incoming/outgoing call from/to Plaintiff.

Plaintiff testified that he and Maynard were not friends and never joked around with each other. Collins Dep. at 93. For the purposes of the present motion, the Court assumes that each of the five statements recounted above were made by Maynard.

### C.

Defendant has a "Harassment Prohibition Policy" that reads, in part:

> **Non-Discrimination Policy**. Employees are always expected to treat their fellow employees . . . with respect. In keeping with this expectation, the Company will not tolerate any form of harassment and complies with the laws prohibiting discrimination on such factors as race . . .
>
> * * * *
>
> **Reporting**. Any employee who believes that he or she is being harassed is encouraged to immediately report any incident(s) to his or her supervisor, the Human Resources Department or the President. The Company shall investigate all complaints of harassment promptly in an impartial manner and as confidentially as possible. If the complaints are determined by the Company to have merit, measures for correction the situation will be immediately taken. In no event will the Company retaliate against any employee for implementing in good faith the procedures of the policy.

Pl. Ex. E, p. 9. *See also id.* at pp. 12-13 (further discussing Defendant's policy on harassment).

### D.

Oster testified that he was notified by Plaintiff on July 27, 2007, via phone, that Maynard had made a comment to Plaintiff about "picking cotton" (Statement #5). Oster Aff. ¶ 6, Def. Ex. 2.[6]

---

[6] As discussed above, Plaintiff testified that Maynard made the "cotton picking" comment "in and around" August 24, 2007. This is one of many illustrations of the confused state of the factual record in this case.

According to Oster, the comment was discussed at a regular business meeting at which Oster, Plaintiff, and Defendant's IT Administrator, Mikki Fletcher, were present. *Id.* at ¶¶ 6, 8. According to Oster, the following events transpired at the July 31, 2007, meeting:

> 7.    Mr. Collins stated that the inappropriate comment that Maynard had allegedly made involved the use of "the N word."  I told Mr. Collins that I was going to refer the matter to Sterling Heights Plant Human Resource Manager Sandra Buckner for investigation.

> \* \* \* \*

> 9.    Mr. Collins asked me not to report the incident to Human Resources because he wanted to first attempt to address the issue directly with Maynard . . . .

> \* \* \* \*

> 11.   Had Collins not asked for the opportunity to resolve the matter directly with Maynard before escalating it to Human Resources, I would have referred the matter to Human Resources immediately.

> 12.   In the July 31, 2007 meeting, I also asked Mr. Collins to immediately notify me if he was not successful in resolving the issue with Maynard or if any other inappropriate comments were made and I would refer the matter to Human Resources.

*Id.* at ¶¶ 7, 9, 11-12.  Fletcher's version of the events occurring at the July 31, 2007, meeting is in accord.  *See* Def. Ex. 9 (e-mail from Fletcher to Oster recounting the events transpiring at the July 31, 2007, meeting).  Plaintiff does not dispute the occurrence of these events except that he "disputes that he told Oster not to report the matter to human resources," as both Oster and Fletcher testified.[7]

---

[7] Defendant's confidential file notes, attached as Exhibit A to Plaintiff's response brief, reflect that Plaintiff "told [Oster] that he was afraid to go to Human Resources because [Buckner] is friends with [Maynard] and he [Plaintiff] didn't think anything would happen."  Pl. Ex. A, p. 1.  *See also id.* at p. 4 (handwritten note stating "[Plaintiff] was afraid to come to HR, [Buckner] & [Maynard] are friends."  Oster's affidavit and Fletcher's e-mail omit the detail that Plaintiff told them that he was afraid to approach human resources regarding the harassment.

Oster further testified: "In my opinion, it was a reasonable approach for Collins to first ask Maynard not to make any more inappropriate comments if Collins wanted the opportunity to do so before escalating the matter to Human Resources."  Oster Aff. at ¶ 10, Def. Ex. 2.[8]

**E.**

According to Defendant, Plaintiff made no further complaints regarding workplace harassment until the end of August 2007.  Plaintiff does not dispute this.  As stated by Oster,

> 14.     On August 31, 2007, after I returned from my vacation, Mr. Collins told me that Maynard had made another inappropriate racial comment. I immediately notified Human Resources Manager Sandy Buckner about Collins' complaint.
>
> 15.     Mr. Collins did not make any [other] complaint to me about any alleged racial comments by any Faurecia employee.

---

[8] In its brief, Defendant states that its

> anti-harassment policy states that complaints of harassment should be brought to the HR department or the Plant Manager for investigation.  (Ex. 10) Oster, a foreign national on a temporary assignment in the U.S., who was not very knowledgeable about U.S. law, was not the Plant Manager, in HR or a high level manager, and had no supervisory authority over Maynard. Oster was not the appropriate Faurecia employee to report alleged harassment to, but Oster took a reasonable approach by suggesting that the Complaint be brought to the attention of HR, and then honoring Collins' request for address the issue himself before escalating the matter to HR.

Def. Br. at p. 3, n.9.  In response, Plaintiff faults Defendant for failing to discipline Oster and Walker, both of whom were managers with either first or second-hand knowledge of the harassment, in accordance with Defendant's policy mandating that "[a]ny manager or supervisor who is made aware of or observes sexual harassment and fails to inform the Human Resources Department or the President shall be subject to disciplinary action . . ."  Pl. Ex. E, p. 9.  Strictly speaking, the cited policy requires managers and supervisors to report only sexual harassment, which is not the type of harassment at issue here.  Nonetheless, notwithstanding the possible absence of a written policy which would have formally required Walker and Oster to report Maynard's conduct, a prudent manager/supervisor would have reported it.

Oster Aff. at ¶¶ 14-15, Def. Ex. 2.[9]

Buckner's affidavit also reflects that she was notified by Oster on August 31, 2007, that Plaintiff had complained to Oster about an inappropriate racial comment made by Maynard. *See* Buckner Aff. at ¶ 3, Def. Ex. 14. Buckner was scheduled to leave for vacation the next day but, prior to her departure, met with HR Generalists Michelle Murray and Adrienne Myrand to inform them of Plaintiff's complaint and to ask them to investigate Plaintiff's allegations. *See id.* at ¶ 4. The events that occurred next are adequately summarized by Buckner in her affidavit:

> 5.    When I returned from vacation, I was informed that Murray interviewed Collins and Maynard on August 31, 2007 and that Maynard denied making the alleged racial comments. I was also informed that on September 4, 2007, Myrand interviewed James Bentley and Richard Howard, both witnesses identified by Collins, but neither individual corroborated the allegations made by Collins.
>
> 6.    The investigation was closed on September 6, 2007, but Mr. Maynard was on vacation from September 7 to September 10, 2007. Even though the investigation did not corroborate Collins' allegations against Maynard, upon Maynard's return to work on September 11, 2007, I issued a written warning to Maynard and notified him that Faurecia would not tolerate any type of racially inappropriate comments and that further complaints about this type of conduct could result in termination.

*Id.* at ¶¶ 5-6. Myrand's version of the events is in accord with Buckner's. *See* Myrand Aff. at ¶¶ 3-5. Defendant's confidential file notes are also consistent. *See* Pl. Ex. A. The written warning issued to Maynard on September 11, 2007, warns that "further complaints of [harassment] will result in immediate termination." Def. Ex. 17.

_____

[9] Plaintiff testified that he called Oster on or around August 24, 2007, the same day as Maynard made the "cotton picking" comment, to report the continued harassment. Collins Dep. at 85. Defendant has attached phone records demonstrating that Plaintiff did not call Oster on that date. *See* Def. Ex. 11.

**F.**

On September 11, 2007, Plaintiff apparently learned of the outcome of Defendant's investigation into the harassment allegations. At one point on that day, Plaintiff testified that Maynard was "just sitting there laughing at me." Collins Dep. at 90. That night, Plaintiff contacted his primary human resources contact, Kristin Wamsley. Wamsley Aff. at ¶ 4, Def. Ex. 18; Def. Ex. 19, ¶ 1 (e-mail from Wamsley to Myrand). According to Wamsley,

> 4. On September 11, 2007, Mr. Collins complained to me that he did not believe that a fair investigation of his complaint . . . had been conducted by the Sterling Heights plant Human Resources department. In particular, Collins alleges that Sandra Buckley was involved in the investigation and that he [Plaintiff] believed that Ms. Buckner was having some sort of a sexual relationship with Mr. Maynard. Mr. Collins never complained to me about any inappropriate racial comments prior to this date.
>
> 5. I contacted Faurecia's Vice President of Human Resources Sandra Murphree and made arrangements for Collins to meet with Murphree on September 13, 2007.

Wamsley Aff. at ¶¶ 4-5, Def. Ex. 18. During the phone call, Plaintiff also summarized the events underlying his complaint of racial harassment. Def. Ex. 18, ¶¶ 7-9. In her September 12, 2007, e-mail to Myrand, Wamsley recounted her phone conversation with Plaintiff in detail. *See* Def. Ex. 18. According to Wamsley, she informed Plaintiff that "it was [her] understanding that a thorough investigation was completed and unfortunately, no witnesses to these allegations could be found." *Id*. at ¶ 10. At that point, Plaintiff identified two additional witnesses to Maynard's alleged harassment: "Shelton the hi-lo driver" and "Jerry the shipping clerk." *Id*.

Buckner denies any sexual relationship with Maynard. According to Buckner, "[t]his allegation is completely false. I did not have any type of sexual relationship with Mr. Maynard whatsoever." Buckner Aff. at ¶ 7, Def. Ex. 14. Union steward Craig Parr, on the other hand,

testified that "[i]t was said by many that Sandy Buckner and Maynard were romantically involved."

Parr Aff. at ¶ 3, Pl. Ex. D.[10]

Murphree took over the investigation into Plaintiff's allegations to avoid an "appearance of

impropriety." Myrand Aff. at ¶ 6, Def. Ex. 15; Murphree Aff. at ¶ 5, Def. Ex. 20. As recounted by

Murphree and Myrand, the following undisputed events occurred on September 13, 2007:

> 7.    Ms. Murphree and I [Myrand] met with Mr. Collins on September 13,
>       2007 and he [Plaintiff] identified new witnesses who he claimed
>       would corroborate his allegations of racial comments by Maynard.
>       [Plaintiff] also . . . asked us to interview Richard Howard again.
>
> 8.    Ms. Murphree and I [Myrand] reinterviewed the original witnesses
>       and interviewed the newly identified witnesses (Shelton Hughes,
>       Jerry Grayson and Edward "Rick" Walker). The formerly identified
>       witness again did not corroborate Collins' allegations. As for the
>       newly identified witnesses, none of them actually heard the
>       statements that Collins complained about, but some of the two
>       witnesses stated that Maynard had admitted to them that he had made
>       a racial comment and some of the witnesses said that Maynard had
>       once said "ooh its dark in here," which they believed to be an
>       inappropriate racial comment.

Myrand Aff. at ¶¶ 7-8, Def. Ex. 15. Murphree testified identically. *See* Murphree Aff. ¶¶ 6-7, Def.

Ex. 20.

Based on the interviews of the newly identified witnesses, Myrand and Murphree concluded

that Maynard had violated Defendant's policy against harassment. Myrand Aff. at ¶ 9, Def. Ex. 15;

------

[10] Parr's affidavit is attached at the end of Plaintiff's Exhibit D. Fed. R. Civ. P. 56(e)(1) requires that "[a] supporting affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Having reviewed Parr's affidavit, the Court notes that the many of the statements asserted therein are speculative and/or not based on the personal knowledge of Parr. Any such statements do not convey facts that may be properly considered at this stage of the litigation. Moreover, the affidavit contains no dates, making it impossible to discern if, or to what extent, the events described therein are relevant.

Murphree Aff. ¶ 8, Def. Ex. 20.  Accordingly, Maynard's employment was terminated the next day – on September 14, 2007.  *See* Def. Ex. 22 (written termination notice to Maynard); Myrand Aff. at ¶ 9, Def. Ex. 15; Murphree Aff. ¶ 8, Def. Ex. 20.  The events described by Myrand and Murphree, discussed above, are consistent with Defendant's confidential file notes, *see* Pl. Ex. A, and undisputed by Plaintiff.[11]

### F.

Plaintiff filed a Charge of Discrimination with the EEOC on September 12, 2007, two days before Maynard was terminated.  *See* Def. Ex. 6.  Defendant subsequently received a Notice of Charge of Discrimination, which is dated September 19, 2007, five days after Maynard was terminated.  *See id.*

### G.

Defendant opted to participate in the EEOC's mediation program.  *See* Pl. Ex. F.  In connection with the mediation efforts, the parties entered into a "Confidentiality Agreement," which reads, in relevant part:

> 2.    The parties agree that all matters discussed during the mediation are confidential, unless otherwise discoverable, and cannot be used as evidence in any subsequent administrative or judicial proceeding. . . .

> 3.    Any communications between ADR Coordinator and the mediator(s) and/or the parties are considered dispute resolution communications with a neutral and will be kept confidential.

*Id.* at ¶¶ 2-3.

---

[11] Walker testified that, at some point, Maynard told him that "he was not worried . . . because he was the mayor and . . . they, (Management), would not get rid of him."  Walker Aff. at ¶ 10, Pl. Ex. D.

The mediation occurred on November 21, 2007.  As described by Defendant,

> during the Mediation . . . Collins presented a stack of documents for review by the Mediator and Faurecia's counsel.  The materials consisted of highly confidential human resource memos, emails and internal documents regarding the investigation, personal computer notes made by HR staff and email exchanges among the HR staff regarding the investigation.

Def. Br. at 6.  Among the confidential documents presented by Plaintiff are those contained in Defendant's Exhibits 8, 23, and 34.  According to Buckner, who was present at the mediation,

> 9.    Mr. Collins had possession of confidential Human Resources documents that he had no authority to access, download or possess.
>
> 10.   Mr. Collins claimed that he had been given these confidential documents by another Faurecia employee, who found them while running a back-up tape, but he refused to provide the name of the employee at the mediation.

Buckner Aff. at ¶¶ 9-10, Def. Ex. 14.  Wamsley testified identically.  *See* Wamsley Aff. ¶¶ 6-7, Def. Ex. 18.  According to both Buckner and Wamsley,

> [i]t is very improbable that the individual documents that Collins possessed could have been located in a single day's download as alleged by Mr. Collins, because they had been created over a wide timeframe and did not represent a single day's processing.

Buckner Aff. at ¶¶ 11, Def. Ex. 14; Wamsley Aff. at ¶ 8, Def. Ex. 18.

Concerned about the apparent security breach, Defendant commenced an investigation into how Plaintiff obtained the confidential documents.  Wamsley Aff. at ¶ 8, Def. Ex. 18.  According to Defendant, "[its] concern was heightened by the fact that HR Manager Buckner had previously reported that someone had tampered with her laptop computer at the plant despite the precautions she regularly took to secure her machine."  Def. Br. at 6-7.  According to Buckner,

> 12.   On several occasions in 2007 . . . , my laptop computer at the Sterling Heights plant was altered between the time I left work in the evening and returned in the morning.

Buckner Aff. ¶ 12, Def. Ex. 14.

At his deposition, Plaintiff testified that the documents were given to him and that he "didn't steal" them. Collins Dep. at 104-105. At a subsequent hearing before the Michigan Employment Security Commission, Plaintiff clarified that the documents "came from" Barnard, who downloaded them for Plaintiff. Def. Ex. 25, p. 86. Barnard, on the other hand, testified to the contrary:

> Mr. Collins' allegation is not true. I did not run backup tapes for the Sterling Heights plant at the Auburn Hills office. In fact, backup tapes for the Sterling Heights [office] are run at that plant, not in Auburn Hills. Also, I did not find a file containing Mr. Collins name while running backup tapes and I never sent any file to Mr. Collins that contained Human Resources documents.

Barnard Aff. at ¶ 5, Def. Ex. 30 (emphasis deleted).

### H.

Defendant's "Netiquette" policy prohibits employees from "attempt[ing] to penetrate secure parts of the Faurecia network or servers or the systems of other employees." Def. Ex. 37, p. 3. Moreover, Defendant's "Email and Data Systems" policy states that "[a]n employee shall not load or download any computer files onto or from the Company's computers without the express written consent of the Information Systems Department, President or Vice-President." Def. Ex. 35, p. 2. Plaintiff was terminated on November 26, 2007, for violating these policies, among others. Wamsley Aff. at ¶¶ 9, 11, Def. Ex. 18.

The events leading up to Plaintiff's termination are described by Wamsley:

> 9.  Collins was off work between November 21, 2007 and November 26, 2007. When he returned to work on November 26, 2007, HR Manager Sandy Buckner and I [Wamsley] met with Collins to find out more information about how he obtained the confidential Human Resources documents . . . .
>
> 10.  At the November 27, 2007 meeting, Collins reasserted that he had

been given the documents by another Faurecia employee but he refused to identify that individual. Collins was advised that if he did not identify the person who allegedly gave the confidential documents to him, or otherwise explain how they had come into his possession, Faurecia would conclude that Collins was responsible for the security breach in addition to his breach of confidentiality and, as a result, his employment would be terminated.

11.     Collins continued to refuse to identify the name of the individual who allegedly provided the documents to him. As a result, I had a good faith belief that Collins was the individual responsible for the security breach and Collins' employment was terminated for his numerous violations of Company policies. Collins' refusal to cooperate in the investigation also constituted insubordination.

Wamsley Aff. at ¶¶ 9-11, Def. Ex. 18.

Plaintiff testified at the Michigan Employment Security Commission hearing that he refused to discuss how he came into possession of the confidential documents because of the Confidentiality Agreement, reproduced in pertinent part above. According to Plaintiff,

Q:     Did anyone ask you where the [confidential documents] came from?

A:     Sandy Buckner.

Q:     Okay. And what was your response?

A:     I said that we should not be talkin' about this 'cause I signed a confidential thing with the EEOC.

* * * *

A:     She was like where did you get the documents from. And I said well we [sic] supposed to not to be talkin' about this. And then she's like so, you ain't gonna tell me. And I was like I ain't talkin' about it. I said, I signed a confidential [unclear] thing and I ain't talkin' about it.
        So then she was like well—well—well I assume that you got 'em yourself so basically, you know, I don't have to [sic] choice but to terminate you.

Pl. Ex. G, pp. 83, 85. In his brief, Plaintiff further states that he "possessed a good faith belief that

14

because he and the Defendant had signed a confidentiality agreement that he was not supposed to speak about the conflict."

Plaintiff called his EEOC investigator on November 26, 2007, the day he was terminated, and "related that he was terminated" because "[h]is employer wanted to know where he got internal documents, which he presented at mediation, and he stated that he would not tell them so they fired him on that basis." Pl. Ex. A, p. 11. (memorandum to file).

After Plaintiff was terminated, Defendant had Plaintiff's Faurecia laptop computer analyzed by a computer forensics firm, Spectrum Computer Forensics & Risk Management, LLC, which concluded, in part, as follows:

> Computer-forensic analysis of M. Collins' Faurecia-issued laptop shows an overwhelming amount of evidence of Collins' opening and copying confidential Human Resources information from the Faurecia network to his laptop.
>
> This information was obtained from a folder restricted to Human Resource personnel, but was accessed by Collins by way of his system-administrator position in the company. Although his system-administrator position gave him access to this folder, it did not give him authorization or permission to open and copy confidential Faurecia information.

Def. Ex. 34, p. 19.

## I.

The present action was filed on February 3, 2009. Defendant filed its Motion for Summary Judgment on February 15, 2010.

## III.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(b), a party against whom a claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Summary judgment is appropriate where the moving party demonstrates that

there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323.

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-1211 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-323. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must

set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the non-moving party to introduce evidence of evidentiary quality demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997).

### III. ANALYSIS

Plaintiff's Amended Complaint contains three counts:

Count I: Retaliation under Title VII
Count II: Retaliation under the ELCRA
Count III: Racial harassment under Title VII and the ELCRA

Defendant contends that it is entitled to summary judgment on each of these counts.[12] With regard to Counts I and II, Defendant argues that Plaintiff's discharge was not retaliatory because he was terminated for stealing confidential human resource documents in violation of Defendant's policies and not in retaliation for filing an EEOC charge or otherwise complaining about racial harassment.

Defendant advances two arguments with respect to Count III. First, Defendant contends that while Maynard's comments, assuming they were made, "are not to be condoned," they are "insufficient to establish that Collins was subjected to a racially hostile environment." Second, Defendant argues that even if Plaintiff could establish that he was subjected to a racially hostile work environment, Defendant—as the employer—cannot be held liable for Maynard's conduct because Defendant did not "tolerate[] and condone[] the situation." The Court addresses Plaintiff's retaliation claims followed by his hostile work environment claims.

### A. Retaliation

---

[12] The Court notes that "[c]ases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases." *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004).

Title VII prohibits an employer from "discriminat[ing] against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). Plaintiff contends that he was terminated in retaliation for engaging in activity protected by Title VII – namely, for filing a complaint with the EEOC and participating in the EEOC mediation process.

Because Plaintiff offers no direct evidence of retaliation, he must prove his retaliation claim using circumstantial evidence.

> In the absence of direct evidence, retaliation claims are governed by the *McDonnell Douglas* burden-shifting framework. In order to establish a prima facie case of retaliation, the plaintiff must show: (1) that the plaintiff engaged in a protected activity; (2) that the defendant had knowledge of the plaintiff's protected conduct; (3) that the defendant took an adverse employment action towards the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action. "The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

*Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002) (certain citations omitted).

> After [the plaintiff] sets out her prima facie case, the burden of production shifts to [the defendant] to offer a non-discriminatory reason for the adverse employment action. If [the defendant] meets this burden, then the burden of production shifts back to the plaintiff to demonstrate that the proffered reason was mere pretext. The burden of persuasion remains with [the plaintiff] throughout, even while the burden of production shifts between the parties.

*Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009) (citations omitted).

The parties in the present case agree that elements (1), (2), and (3) of Plaintiff's prima facie case are satisfied; the disagreement surrounds element (4), causation. However, the Court need not determine whether there is a causal connection between the protected activity in this

case—Plaintiff's complaints of racial harassment, his filing of an EEOC complaint, and his participation in the EEOC mediation process—and the adverse employment action, Plaintiff's termination. This is because Plaintiff cannot show that Defendant's proffered non-discriminatory reason for the termination was a mere pretext.

Defendant claims that Plaintiff was terminated, not because he engaged in protected activity, but because he improperly downloaded and possessed confidential human resource documents and refused to disclose the name of the individual who he claimed gave him the documents, all in violation of Defendant's policies, discussed above. In order to show that this reason is a mere pretext for discrimination, Plaintiff "must produce evidence that either the . . . reason: (1) has no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse action." *Ladd*, 552 F.3d at 502. Moreover,

> as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect. An employer has an honest belief in its reason for discharging an employee where the employer reasonably relied "on the particularized facts that were before it at the time the decision was made."

*Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (citations omitted) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-807 (6th Cir. 1998)).

Plaintiff has failed to produce any evidence from which a reasonable jury could conclude that Defendant's proffered non-retaliatory reason for the termination was pretextual. It is undisputed that Wamsley and Buckner met with Plaintiff on November 26, 2007, "to find out more information about how he obtained the confidential Human Resources documents." Wamsley Aff. at ¶ 9, Def. Ex. 18. Plaintiff admits that he was uncooperative with the investigation and refused to reveal who provided him with the confidential documents. It is also undisputed that Plaintiff was advised

during the November 26, 2007, meeting, that if he did not identify the employee who provided him with the confidential documents, or otherwise explain how he came into possession of the documents, Defendant would conclude that he was responsible for the security breach and his employment would be terminated. *See id.* at ¶ 10. Plaintiff refused to cooperate with the investigation despite this warning, leaving Defendant with no choice but to conclude that he was responsible for violating Defendant's computer policies. In addition, Wamsley concluded that Plaintiff's "refusal to cooperate in the investigation . . . constituted insubordination." *Id*. at ¶ 11. Plaintiff has adduced no evidence that these non-discriminatory reasons for the termination (1) have no basis in fact, (2) did not actually motivate the termination, or (3) were insufficient to warrant termination. In fact, Plaintiff admitted to the EEOC investigator that he was terminated because he would not identify the person responsible for providing him with the confidential documents. *See* Pl. Ex. A, p. 11.

Plaintiff contends that his silence during the investigation was justified in light of the Confidentiality Agreement. This argument is without merit. As discussed, as part of the EEOC mediation efforts, Plaintiff and Defendant entered into a Confidentiality Agreement, which provided, in relevant part:

> 2.  The parties agree that all matters discussed during the mediation are confidential, unless otherwise discoverable, and cannot be used as evidence in any subsequent administrative or judicial proceeding. . . .
>
> 3.  Any communications between ADR Coordinator and the mediator(s) and/or the parties are considered dispute resolution communications with a neutral and will be kept confidential.

Pl. Ex. F at ¶¶ 2-3. This agreement in no way shields Plaintiff from punishment for employment-related misconduct; it merely states that matters discussed during mediation cannot be used against

the parties later "in any subsequent administrative or judicial proceeding."

Plaintiff also makes much of the fact that his laptop was not analyzed until well after he was terminated and therefore, "Defendant . . . could not have been motivated by knowledge that it did not have until much later." However, the forensic analysis merely confirmed Defendant's honest suspicion, supported by other facts, that Plaintiff had violated its computer policies. The fact remains that Plaintiff was terminated because he refused to explain his unauthorized possession of confidential company documents despite Defendant's warning that his refusal would constitute grounds for termination.

Finally, Plaintiff's retaliation claims are foreclosed by case law. *See Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 728-729 (6th Cir. 2008) (employee's dissemination of confidential documents in violation of employer's privacy policy constituted a non-pretextual reason supporting employee's termination); *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1149, 1153-1154 (10th Cir. 2008) (employer had a legitimate, non-retaliatory, and non-pretextual reason for adverse employment action where employee illegally, and in violation of company policy, supplied unredacted medical records to the EEOC in order to bolster her Title VII discrimination claim); *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763-764 (9th Cir. 1996) (an employee who rummaged through his supervisor's office in search of documents for use in future Title VII litigation was legally discharged for such misconduct; the Ninth Circuit was "loathe to provide employees an incentive to rifle through confidential files looking for evidence that might come in handy in later litigation. [Title VII] protects reasonable attempts to contest an employer's discriminatory practices; it is not an insurance policy, a license to flaunt company rules or an invitation to dishonest behavior"); *Jefferies v. Harris County Cmty. Action Ass'n*, 615 F.2d 1025,

1036 (5th Cir. 1980) (unauthorized copying and disseminating of confidential personnel documents in violation of employer's policy, even if for use in a discrimination lawsuit, is not "protected activity" under Title VII and constitutes a non-retaliatory, non-pretextual reason supporting an adverse employment action where the employee fails to show a need for the surreptitious copying and dissemination).

## B.  Hostile Work Environment

"Title VII prohibits racial harassment that creates a hostile or abusive work environment." *Newman v. Fed. Exp. Corp.*, 266 F.3d 401, 405 (6th Cir. 2001).  "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations omitted).  In the Sixth Circuit,

> [i]n order to establish a prima facie case of hostile work environment based
> on race under Title VII, a plaintiff must show: 1) that he is a member of a
> protected class; 2) that he was subjected to unwelcome racial harassment; 3)
> that the harassment was based on race; 4) that the harassment had the effect of
> unreasonably interfering with his work performance by creating an
> intimidating, hostile, or offensive work environment; and 5) the existence of
> employer liability.

*Id*.  Only elements (4) and (5) are disputed in this case.

### 1. "Severe and Pervasive"

As stated by the Sixth Circuit,

> [t]o assess the fourth prong of an asserted prima facie case, we must examine
> the totality of the circumstances.  In doing so, we consider "the frequency of
> the discriminatory conduct; its severity; whether it is physically threatening
> or humiliating, or a mere offensive utterance; and whether it unreasonably
> interferes with an employee's work performance."  "[C]onduct must be
> extreme to amount to a change in the terms and conditions of employment .

22

> . . ." "[S]imple teasing, . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."

*Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009) (citations omitted). The phrase "totality of the circumstances," used above, means that:

> (1) offensive conduct need not be directed at the plaintiff, (2) the plaintiff need not be present at the time of the offensive conduct; instead, she or he can learn of the conduct second-hand, (3) racial or sexual animus can be inferred from conduct not overtly racial or sexual in nature when the context suggests it, and (4) blue collar work environments do not have more leeway when it comes to offensive conduct.

*Ladd*, 552 F.3d at 500 (citations omitted). Moreover, "[t]he conduct must be judged by both an objective and subjective standard. That is, the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile, and the victim must subjectively regard that environment as hostile." *Sweezer v. Mich. Dep't of Corrections*, 229 F.3d 1154 (Table), 2000 WL 1175644, at *4 (6th Cir. Aug. 11, 2000) (unpublished).

The Court finds the conduct here to be both objectively and subjectively severe and pervasive so as to create an environment that a reasonable person would find hostile. The facts conclude that Maynard's continuing outrageous racially offensive comments amounted to a hostile work environment. His comments were not in any way related to a personality conflict with Plaintiff; nor were they mere "offhand comments." The comments were, at the core, racially offensive not just to Plaintiff, but to all African-Americans. This Court will not "minimize proof of persistent racial slurs." *See Jackson v. Quanex Corp.*, 191 F.3d 647, 662 (6th Cir. 1999).

Plaintiff alleges five incidents of harassment over the course of his eleven month period of employment with Defendant. Plaintiff admits in his response brief that he "was subject to racial slurs over a short period of time between June and August." Resp. at 10. However, Maynard's

comments were not "brief and isolated." Successful racially hostile work environment claims need not involve some element of racial violence. Maynard's comments, often made in front of co-workers, are detestable and, taking the evidence in the light most favorable to Plaintiff, sufficiently "severe and pervasive" such that the conditions of his employment have been altered.

### 2. Employer Liability

In order to prove employer liability, Plaintiff must "prove that her employer 'tolerated or condoned the situation' or 'that the employer knew or should have known of the alleged conduct and failed to take prompt remedial action.'" *Jackson*, 191 F.3d at 659 (quoting *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir. 1988)). In addition,

> employer liability in cases of coworker harassment is not derivative, but instead depends on the employers "own acts or omissions." An employer's response is unreasonable if it "manifests indifference or unreasonableness in light of the facts the employer knew or should have known." A response is generally adequate, however, if it is "reasonably calculated to end the harassment."

*Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 340 (6th Cir. 2008) (citations omitted).

Defendant asserts two arguments in support of its position that Plaintiff cannot prove employer liability. First, Defendant argues that it promptly terminated Maynard after Plaintiff identified two witnesses who, for the first time, corroborated Plaintiff's allegations of racial harassment by Maynard. These new witnesses were identified by Plaintiff on September 13, 2007, and Maynard was terminated the next day, on September 14, 2007. However, the undisputed facts demonstrate that Defendant (1) had actual knowledge of Maynard's racial harassment long before September 13, 2007—on July 27, 2007, when Plaintiff notified Oster—and (2) did not start

investigating the harassment until one month later, on August 31, 2007.[13]  Taking the facts in the light most favorable to Plaintiff, a reasonable jury could find that Oster's one-month period of inaction amounted to an indifferent or unreasonable response that was not reasonably calculated to end the harassment.

Defendant argues that Oster was justified in not taking any corrective action, for over a month, to end the harassment.  This is because, according to Defendant, Plaintiff asked Oster not to report the harassment to human resources or higher authority until he (Plaintiff) first attempted to resolve the situation with Maynard directly.  Oster testified:

> 7.    At the July 31, 2007, meeting Mr. Collins stated that the inappropriate comment that Maynard had allegedly made involved the use of "the N word."  I told Mr. Collins that I was going to refer the matter to Sterling Heights Plant Human Resource Manager Sandra Buckner for investigation.
>
> * * * *
>
> 9.    Mr. Collins asked me not to report the incident to Human Resources because he wanted to first attempt to address the issue directly with Maynard.  Collins did not raise any concern about reporting the incident to Human Resources - or to Sandra Buckner.
>
> 10.   In my opinion, it was a reasonable approach for Collins to first ask

---

[13] Oster testified:

> 6.    On Friday, July 27, 2007, I received a call from Mr. Collins.  In that telephone call, Mr. Collins said that . . . Michael Maynard had made an inappropriate comment to him about "going out back to the cotton fields."
>
> 7.    At the July 31, 2007, meeting Mr. Collins stated that the inappropriate comment that Maynard had allegedly made involved the use of "the N word."

Oster Aff. ¶¶ 6-7, Def. Ex. 2.

> Maynard not to make any more inappropriate comments if Collins
> wanted the opportunity to do so before escalating the matter to
> Human Resources.

11. Had Collins not asked for the opportunity to resolve the matter
directly with Maynard before escalating it to Human Resources, I
would have referred the matter to Human Resources immediately.

Oster Aff. ¶¶ 7, 9-11, Def. Ex. 2.

On the other hand, Defendant's confidential file notes, attached as Exhibit A to Plaintiff's

response brief, reflect that Plaintiff "told [Oster] that he was afraid to go to Human Resources

because [Buckner] is friends with [Maynard] and he [Plaintiff] didn't think anything would happen."

Pl. Ex. A, p. 1. *See also id.* at p. 4 (handwritten note stating "[Plaintiff] was afraid to come to HR,

[Buckner] & [Maynard] are friends." Defendant does not address this in its motion papers. Oster's

failure to report Plaintiff's complaint of harassment may have been reasonable had his inaction

stemmed from Plaintiff's genuine desire to resolve the issue with Maynard before escalating the

matter. However, if the jury credits Defendant's own confidential file notes, which reflect that

Plaintiff told Oster that he was afraid to report the harassment to human resources because Buckner

and Maynard were "friends," the jury could reasonably conclude, taking the facts in the light most

favorable to Plaintiff, that Oster's failure to take any corrective action for more than a month was

unreasonable under the circumstances and indicative of indifference on the part of Oster/Faurecia.[14]

Finally, Defendant argues that even if Oster acted unreasonably in failing to report Plaintiff's

complaints sooner, it is not liable for Oster's inaction "because he was not a high level management

---

[14] During oral argument, Plaintiff's counsel stated that Plaintiff never instructed Oster to
refrain from reporting the matter to human resources; rather, Plaintiff told Oster that he was
afraid to report the matter to human resources since Maynard and Buckner were friends. As
discussed, Defendant's own confidential file notes are in accord with this version of the events.

employee whose knowledge of Collins' complaint could be imputed to [it]." Def. Mot. at 15. Thus, Defendant argues that reporting the harassment to Oster was insufficient to put Defendant on notice of the harassment, triggering a duty on the part of Defendant to take corrective action.

The law in the Sixth Circuit requires that "the complaint be made to 'higher management' unless the harassment is so pervasive that constructive knowledge may be inferred." *Hartleip v. McNeilab, Inc.*, 83 F.3d 767, 777 (6th Cir. 1996) (internal citations omitted). Oster was an "on-site Logistics Manager" at Defendant's Sterling Heights plant. Oster Aff. ¶¶ 3-4, Def. Ex. 2. Plaintiff reported to Oster, assuming him to be higher management. While Defendant's pleadings attempt to neuter Oster's responsibility with regard to Plaintiff's complaint by arguing that he was a recent European transplant, this does not carry the day. Taking the evidence in the light most favorable to the non-moving party, the Court leaves this issue of employer liability for the jury to resolve.

## IV. CONCLUSION

For the reasons stated, summary judgment is granted in favor of Defendant on Plaintiff's Title VII and ELCRA retaliation claims. Summary judgment is denied on Plaintiff's Title VII and ELCRA racially hostile work environment claims.

SO ORDERED.

Dated: September 3, 2010

S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on September 3, 2010.

S/Denise Goodine
Case Manager